UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| STACY WARBOYS, : | |
|     Plaintiff, : | |
| : | CIVIL ACTION NO. |
| v. : | 3:02-cv-1456 (JCH) |
| : | |
| WILLIAM PROULX, : | |
| TOWN OF EAST HARTFORD, : | |
| and MARK SIROIS, : | |
|     Defendants. : | FEBRUARY 4, 2004 |

**RULING GRANTING
PLAINTIFF'S MOTION TO AMEND COMPLAINT [DKT. NO. 24]
AND
GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT [DKT. NO. 17]**

Plaintiff Stacy Warboys brings this section 1983 action against the Town of East Hartford in Connecticut and against one of its police officers, William Proulx, and its chief of police, Mark Sirois, in their individual and official capacities (collectively, "the defendants"). The lawsuit arises from an incident in which Proulx shot and killed Warboys' pitbull dog as it approached him and his police canine while they were attempting to track a fleeing suspect. The original complaint alleges state claims for intentional and negligent infliction of emotional distress against Proulx and indemnity against East Hartford, as well as federal causes of action, including a negligent supervision claim and due process claims. See Notice of Removal [Dkt. No. 1], Complaint (attached). The defendants moved for summary judgment with respect to the entire complaint [Dkt. No. 17]. Warboys

subsequently moved to amend his original complaint [Dkt. No. 24], by, among other things, adding a Fourth Amendment claim.  For the reasons that follow, the court grants both motions.

I.    FACTS & PROCEDURAL HISTORY

The following recitation presents the facts in the light most favorable to Warboys but notes any material factual disputes between the parties.  On May 12, 2001, Officer Proulx and his trained police canine, Dakota, were tracking a fleeing car theft suspect.  They were being assisted by two fellow officers, who were following as back-up.  Dakota wore a tracking harness.  The scent trail of the suspect led the police dog and the three officers to the rear parking area of 21 Linden Street, where they stopped to allow Dakota to identify a pool of scent,[1] possibly left by the suspect.

While in the rear of 21 Linden Street, Proulx saw a young male exiting the door of 25 ½ Linden Street, a neighboring multi-family residence.  (The young man was later identified as Anthony Malave, the teenage brother of Warboys.  Warboys, Blitz's owner, was not present during the incident.)  Proulx advised the teenager to return to the residence for his own safety.  The family's pet pit bull dog, Blitz, who weighed an estimated 90-100 lbs, then escaped through the opened door, at which point Malave made a failed attempt to

---

[1] Apparently, a pool of scent may indicate an area where the person being tracked stopped and stayed for a period of time.

grab Blitz. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl's Mem. Opp.") [Dkt. 22], Ex. D: Malave Dep., at 17. One of the accompanying officers yelled, "Pit bull!" As the dog moved toward Proulx and his canine, Malave yelled to the officers something to the effect of: "[H]e won't hurt you." Proulx unholstered his service pistol and fired one shot into the dog's head, killing him. Blitz was shot approximately 30 feet from the door of 25 ½ Linden Street and approximately 5-10 feet from Officer Proulx.[2] The parties also agree that incident occurred very quickly, with not more than approximately 5 seconds elapsing from the time the pit bull ran from the house until Proulx shot him.[3]

For purposes of the motion for summary judgment, the court accepts the testimony offered by Malave that, rather than barking or growling, Blitz emerged from the house "in a friendly mood," "with his tail wagging." Pl's Mem. Opp., Ex. G: Malave Dep., at 20. The court further accepts the testimony offered by Warboys that Blitz was a gentle, loving pet that had never attacked an animal or a person. See, e.g., Pl's Mem. Opp., Ex. B: Lois

---

[2] The only eye-witness testimony produced by Warboys on this and other issues of fact concerning how exactly the shooting transpired was that of Malave. Malave's own testimony indicated that Blitz was 30 feet from the front door when Proulx shot him. See Pl's Mem. Opp., Ex. G: Malave Dep., at 19.

[3] When asked to estimate how many seconds had elapsed between the time the dog left the doorway of the house and when it was shot, Malave himself answered: "Within five seconds." See Defendants' Reply to Plaintiff's Opposition Memorandum of Law ("Defs' Reply") [Dkt. 25], Ex. P: Malave Dep., at 19.

Warboys Dep., at 22.

      Warboys commenced this action by filing the original complaint, dated July 18, 2002, in Connecticut state court. However, on August 20, 2002, the defendants together removed the case to this court, alleging federal question jurisdiction pursuant to 28 U.S.C. § 1441. The Amended Complaint, dated June 18, 2003 [Dkt. No. 24], alleged seven counts, only two of which include federal claims: 1) a state law claim for negligent infliction of emotional distress against Proulx; 2) a state law claim for intentional infliction of emotional distress against Proulx; 3) Fourth Amendment claims[4] and due process claims under the Fifth and Fourteenth Amendments, brought pursuant to 42 U.S.C. § 1983, against Proulx; 4) a state law indemnity claim against East Hartford, brought pursuant to Connecticut General Statutes § 7-465 arising from Proulx's negligence; 5) a state law claim against Sirois for negligent supervision; 6) a second negligent supervision against Sirois, brought pursuant to section 1983; and 7) a second indemnity claim under Conn. Gen. Stats. § 7-465 against East Hartford based on Sirois' negligence. Warboys seeks compensatory damages as well as attorney's fees and costs under § 1983. In their Answer [Dkt. 12], the defendants assert a number of affirmative defenses, including qualified immunity.

---

    [4] As noted below, this Fourth Amendment claim was added to Count Three in the Amended Complaint but was not alleged in the original complaint [Dkt. No. 1].

On April 30, 2003, the defendants moved for summary judgment with respect to the entire complaint. However, on June 27, 2003, Warboys moved for leave to file an Amended Complaint [Dkt. 24], dated June 18, 2003, which adds a cause of action for unlawful seizure of Blitz under the Fourth Amendment and alters some descriptive language in the original complaint concerning the sped with which Blitz approached Proulx and his canine. The defendants have objected to the motion and request that the court deny leave to amend, citing the fact that the time for amending the pleadings has expired and arguing that they would suffer undue prejudice if the request were granted. See Objection to the Plaintiff's Motion for Leave to Amend ("Defs' Objection to Motion to Amend") [Dkt. No. 26].

## II. DISCUSSION

For the reasons stated below, the court grants Warboys' motion to amend the complaint. The court also grants in full the defendants' motion for summary judgment with respect to all causes of action in the Amended Complaint. Because the court concludes that no genuine issue of material fact exists with respect to Warboys' constitutional claims, it does not need to reach the qualified immunity defense raised by the defendants.[5]

---

[5] However, should the court's conclusion that the defendants did not violate Warboys' constitutional rights be determined to have been incorrect, the court holds in the alternative that the doctrine of qualified shields them from liability in their individual capacities in any case.

A.  **Motion to Amend Complaint**

The court grants Warboys' motion to amend the complaint. Rule 15 of the Federal Rules of Civil Procedure establishes a liberal policy in favor of allowing amendments. See generally Foman v. Davis, 371 U.S. 178, 182 (1962). Even if the time limit for amending the pleadings has expired, "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." Id. According to the Supreme Court in Foman,

> [i]n the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be 'freely given.'

Id. at 182. The defendants have not alleged bad faith, and the court concludes that allowing the amendment would not prejudice the defendants. As will be explained in more detail below, even if the court accepts the alterations in the language used in the complaint to describe the sped with which Blitz approached Proulx and his canine and also considers the new Fourth Amendment claim alleged in the Amended Complaint, a grant of summary judgment in favor of the defendants with respect to all claims is warranted. Thus, the court exercises its discretion and grants the motion to amend.

B.  **Motion for Summary Judgment**

1. Legal Standard. Summary judgment is appropriate only when no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Hermes Int'l v. Lederer de Paris Fifth Ave, Inc., 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000)(citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). In assessing the record to determine if such issues exist, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir.1994). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a

motion for summary judgment." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

  2. Factual Dispute.  The only potentially material factual dispute between the parties concerns the speed with which the pit bull approached Proulx and his police canine.  While Warboys' original complaint states that "[t]he pitbull *ran* toward defendant Proulx and his K-9 'Dakota,'" Complaint, at ¶ 7 [Dkt. No. 1] (emphasis added), the Amended Complaint alleges that "[t]he pitbull *moved* toward defendant Proulx and his K-9 'Dakota,'" Amended Complaint, at ¶ 7 (emphasis added).  The defendants argue that motion to amend should be denied and that Warboys should be bound by the original language and that fact that Blitz "ran" at Proulx should be deemed admitted.  See Defs' Objection to Motion to Amend, at 3, ¶ 13.

  The court finds this somewhat semantic dispute to be beside the point because this dispute concerns conflicting allegations.  It is the record before the court that determines whether a material factual issue exists.  See generally Lipton, 71 F.3d at 469.  The most

favorable evidence in the record relating to the dog's movement is that the pit bull travelled a distance of approximately 30 feet in 5 seconds. These figures suggest that the pit bull was travelling at a speed of 6 feet per second.[6] Assuming, in light of the absence of any evidence suggesting that Blitz slowed down as he neared Proulx, that the dog was approaching at a fairly uniform pace,[7] Blitz would have reached Proulx and his canine, who were standing about 5-10 feet away from Blitz when Proulx fired, in about 1 ½ seconds if they were 10 feet away[8] and in less than a second if they were only five feet away.[9] Thus, taking the evidence in the light most favorable to Warboys, Proulx shot Blitz when the dog was one-and-a-half seconds, or less, away from him and his canine.

     3. <u>Section 1983 Fifth Amendment Claim (Count Three)</u>. In Count Three of the Amended Complaint, Warboys claims that Proulx violated his fifth amendment rights by shooting and killing his dog, thereby depriving him of his property without just compensation. <u>See</u> Memorandum of Law in Support of Defendants' Motion for Summary

---

[6] To calculate average speed, one divides the distance traveled by the time it took to travel this distance.
    [distance ÷ time = speed  or  30 feet ÷ 5 seconds = 6 feet/second]

[7] These calculations likely underestimate the dog's speed because they do not account for a possible period of acceleration.

[8] To calculate the time it will take to travel a certain distance, one divides the distance to be travelled by the average speed at which the object is travelling.
    [distance ÷ speed = time  or  10 feet ÷ 6 feet/second = approximately 1.66 seconds]

[9] [distance ÷ speed = time  or  5 feet ÷ 6 feet/second = approximately .83 seconds]

Judgment ("Defs' Mem. Supp. MSJ") [Dkt. No. 18], Ex. F: Plaintiff's Responses to Interrogatories, #6.  However, the defendants correctly assert that this claim is unripe because Warboys has not complied with the compensation requirement of Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194 (1985) by first seeking just compensation from the state.  See Villager Pond v. Town of Darien, 56 F.3d 375, 379-80 (2d Cir. 1995); see generally Santini v. Conn. Hazardous Waste Mgmt. Serv., 342 F.3d 118, 124 (2d Cir. 2003)(discussing Williamson County's two ripeness requirements but focusing on the "final decision" prong).[10]  The court therefore dismisses Warboys' fifth amendment claim brought pursuant to § 1983 as unripe.[11]

      4. Section 1983 Fourth Amendment Claim (Count Three).  Warboys claims that Proulx violated his fourth amendment rights by unreasonably killing, and thereby

---

[10] As the Second Circuit noted in Santini, "[t]he requirement of Williamson County that a property owner must pursue compensation through available state procedures, such as a state-law inverse condemnation action, before bringing a Fifth Amendment takings claim has created a Catch-22 for takings plaintiffs." See Santini, 342 F.3d at 127.  Moreover, the Circuit Court noted that, under Connecticut law, plaintiffs cannot litigate in state court their federal takings claim brought pursuant to the Fifth Amendment. See id. (citing Melillo v. City of New Haven, 249 Conn. 138, 154 n.28 (1999)(noting "the existence of a legally sufficient procedure, under article first, § 11, of the constitution of Connecticut, to obtain just compensation for the alleged taking of their property")).  To solve this legal dilemma, the Santini court crafted the so-called "Santini reservation," so that a state court's judgment on a state-law takings claim would not have preclusive effect in subsequent federal action.  Id. at 130.

[11] The court gives Warboys leave to amend his complaint within thirty days if he has a basis in fact to allege that he has meet this "just compensation" requirement. See Fed. R. Civ. P. 11.

unlawfully seizing, his dog.  Because the court finds that the seizure was not unreasonable and therefore did not violate the fourth amendment, the court grants summary judgment in favor of Proulx on this claim.

Based on the undisputed facts recited above, when taken in the light most favorable to Warboys, Proulx acted reasonably in shooting Blitz.  An officer who encounters a 90- to 100-pound pit bull dog–a dog which is demonstrably not able to be restrained by its owner or guardian and which is approaching the officer at a rate of 6 feet per second and is at a distance of no more than ten feet–does not act unreasonably in shooting the dog in order to protect himself and his canine companion.  Compare Altman v. City of High Point, 330 F.3d 194, 206 (4th Cir. 2003)(finding reasonable shooting of fleeing dog by officer when dog, which was part pit bull, had reportedly been behaving aggressively, notwithstanding fact that dog had not attacked anyone),[12] with Brown v. Muhlenberg Township, 269 F.3d

---

[12] In Altman, the Fourth Circuit reasoned:
The Altman Incident presents a somewhat closer case since Hot Rod had not actually attacked a person. We nevertheless conclude that Officer Moxley's actions were reasonable.  Hot Rod was part pit bull, and pit bulls, like Rottweilers, are a dangerous breed of dog.  While Hot Rod had not attacked anyone, his behavior toward the meter reader was sufficiently aggressive to cause Evans to call the police.  Responding to that call, Officer Moxley was immediately con fronted with a fleeing dog. It was not unreasonable for him to conclude, in that split second as Hot Rod sped away, that he could not safely capture the animal. Thus, as High Point Ordinance § 12-216(b) instructs him to do, Officer Moxley attempted to and succeeded in killing the animal, thereby removing, for all Moxley knew, a potentially dangerous pit bull from the public streets.
Id.

205, 210-11 (3rd Cir. 2001)(although "state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger," "the state may not, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody."). See generally Erwin v. County of Manitowoc, 872 F.2d 1292, 1299-1300 (7th Cir. 1989)(remanding for new trial after jury verdict against officer because there was a question of fact whether officer acted in self-defense in shooting the dog); Fuller v. Vines, 36 F.3d 65, 67-68 (9th Cir. 1994)(reversing district court's grant of summary judgment on fourth amendment claim that officer unreasonably shot family dog); Pfeil v. Rogers, 757 F.2d 850, 865 (7th Cir. 1985)("We therefore hold that because the dogs were unlicensed and had been running at large, the defendants' actions in entering Rob's property without a search warrant were authorized under Wisconsin law and thus no issue of fact remains as to the plaintiff's claim of a Fourth Amendment violation" with respect to shooting of dogs.).

    The court acknowledges that Blitz may indeed have approached the officer and his police canine merely to greet and sniff them or to receive a friendly pat on the head. At the same time, however, the court notes that had Proulx refrained from shooting the pit bull when he did and had Blitz's behavior turned out to have been hostile, it would have been too late for Proulx to use his firearm safely in order to defend himself and his police dog. Had Proulx refrained from shooting and instead had to defend himself from Blitz by other

means in close range attack, the risk of serious injury or death to him and his canine would have been considerable. Based on these facts, this court concludes that the law did not require Proulx to wait until the approaching animal was within biting distance or was leaping at him before taking protective action. The fact that the approaching dog was a pit bull is another factor that supports the court's conclusion that it was objectively reasonable for Proulx to have responded to the situation as he did.[13]

---

[13] Although the court assumes for purposes of this motion that Blitz was a friendly, nonviolent dog who would not have harmed the officers or the police canine, a reasonable officer in Proulx's position would not have known this and could reasonably have assumed the contrary. Again, without impugning the mild-mannered nature of Blitz in particular, the court takes judicial notice of just a few of the legal opinions issued by federal circuit courts which mention pit bulls. See, e.g., United States v. Sutton, 336 F.3d 550, 551 (7th Cir. 2003)("the police discussed several potential threats to officer safety--including the fact that pit bull dogs (known for their hostility to strangers) had been seen on the property"); Altman v. City of High Point, 330 F.3d 194, 206 (4th Cir. 2003)("Hot Rod was part pit bull, and pit bulls, like Rottweilers, are a dangerous breed of dog."); United States v. Wheeler, 67 Fed. Appx. 296, 2003 U.S. App. LEXIS 10887, *300 (6th cir. May 29, 2003)(unpublished opinion)("Wheeler also appeals the Government's introduction of evidence that he owned vicious pit bull dogs that were used to protect his drug operations."); see generally Russell G. Donaldson, "Validity and Construction of Statute, Ordinance, or Regulation Applying to Specific Dog Breeds, Such as 'Pit Bulls' or 'Bull Terriers,'" 80 A.L.R.4th 70 (2003).

One federal district court in particular made the following findings of fact concerning pit bulls before upholding a municipal ordinance that prohibited the owning or harboring of Pit Bull Terriers or other vicious dogs:

> Pit Bulls also possess the quality of gameness, which is not a totally clear concept, but which can be described as the propensity to catch and maul an attacked victim unrelentingly until death occurs, or as the continuing tenacity and tendency to attack repeatedly for the purpose of killing. It is clear that the unquantifiable, unpredictable aggressiveness and gameness of Pit Bulls make them uniquely dangerous.
>
> Pit Bulls have the following distinctive behavioral characteristics: a) grasping strength, b) climbing and hanging ability, c) weight pulling ability, d) a history of

The law simply does not require a reasonable officer in Proulx's circumstances to have used less force to protect himself, his police dog, and the officers standing nearby.[14]

---

> frenzy, which is the trait of unusual relentless ferocity or the extreme concentration on fighting and attacking, e) a history of catching, fighting, and killing instinct, f) the ability to be extremely destructive and aggressive, g) highly tolerant of pain, h) great biting strength, i) undying tenacity and courage and they are highly unpredictable.
> While these traits, tendencies or abilities are not unique to Pit Bulls exclusively, Pit Bulls will have these instincts and phenotypical characteristics; most significantly, such characteristics can be latent and may appear without warning or provocation.
> The breeding history of Pit Bulls makes it impossible to rule out a violent propensity for any one dog as gameness and aggressiveness can be hidden for years. Given the Pit Bull's genetical physical strengths and abilities, a Pit Bull always poses the possibility of danger; given the Pit Bull's breeding history as a fighting dog and the latency of its aggressiveness and gameness, the Pit Bull poses a danger distinct from other breeds of dogs which do not so uniformly share those traits.
> While Pit Bulls are not the only breed of dog which can be dangerous or vicious, it is reasonable to single out the breed to anticipate and avoid the dangerous aggressiveness which may be undetectable in a Pit Bull.

Vanater v. South Point, 717 F. Supp. 1236, 1240-41 (S.D. Ohio 1989).

[14] As noted in note 5, supra, should the court's conclusion that the defendants did not violate Warboys' fourth amendment rights be determined to have been incorrect, the court holds in the alternative that the doctrine of qualified shields them from liability in their individual capacities in any case.

With respect to qualified immunity, the Second Circuit has held:

> Police officers are immune from liability for money damages in suits brought against them in their individual capacities if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." We have explained that "even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." A police officer's actions are objectively unreasonable, and therefore are not entitled to immunity, when "no officer of reasonable competence

5. <u>Section 1983 Fourteenth Amendment Due Process Claim (Count Three)</u>.  The court likewise rejects Warboys' claim that Proulx's actions violated his substantive due process rights under the fifth amendment, which applies to the states by way of the Fourteenth Amendment.  "Due process in the substantive sense protects against government power arbitrarily and oppressively exercised.  . . . '[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'  Accordingly, the 'cognizable level of executive abuse of power' required to establish a claim for violation of substantive due process is 'that which shocks the conscience.'"  <u>Newell v. Kuryan</u>, 155 F. Supp. 2d 402, 405 (E.D. Penn. 2001)(quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998)).  For the reasons stated above, the court has concluded that Proulx's actions were justified under the circumstances, and the court likewise concludes that Proulx's conduct did not involve the high level of culpability required to satisfy the "shocks-the-conscience" standard of substantive due process.  <u>Accord</u> <u>Graham v. Connor</u>, 490 U.S. 386, 392-395 (1989)(contrasting the fourth amendment "reasonableness" standard with the substantive due process standard and concluding that pre-arrest excessive force claims

---

could have made the same choice in similar circumstances."

<u>Anthony v. City of New York</u>, 339 F.3d 129, 137 (2dCir. 2003).  Thus, even if Proulx's shooting of Blitz constituted an unreasonable seizure under the fourth amendment, the court concludes that "it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act," <u>id.</u>, and that he was therefore entitled to qualified immunity.

are to be analyzed under the former, more deferential standard); Saucier v. Katz, 533 U.S. 194 (2001)(same)(citing Graham, 490 U.S. 386); Lewis, 523 U.S. 833(discussing "deliberate indifference" formulation).  Summary judgment in favor of the defendants is therefore granted on this claim as well.[15]

      6. Federal Negligent Supervision Claim Against Sirois (Count Six).  In Count Six, Warboys brings a federal negligent supervision claim against Sirois pursuant to § 1983. Because the court concludes that Warboys has suffered no constitutional injury as a result of Proulx's actions, his federal negligent supervision claim under Count Six must fail.  See City of Los Angeles v. Heller, 475 U.S. 796, 810-11 (1986)(because the city and the commission were parties to the damages action based on their responsibility for the officer's actions, they could not be liable if the officer had inflicted no constitutional injury); Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001)("a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate Warboys' constitutional rights" but "where alleged injuries are not solely attributable to the actions of named individual defendants, municipal liability may still be found"). Additionally, the court finds that Warboys has presented no evidence whatsoever to support his conclusory allegations that Sirois violated federal law by "fail[ing] to instruct, supervise,

---

[15] Because Warboys does not argue that his procedural due process rights were violated by the shooting of his dog, see, e.g., Pl's Mem. Opp., at 4-7; Defs' Mem. Supp. MSJ, Ex. F: Plaintiff's Responses to Interrogatories, ## 6 & 7, the court does not address this claim.

control and discipline on a continuing basis defendant Officer William Proulx in his duties. . . ,'' as is alleged in paragraph 17 of the Sixth Count of the Amended Complaint.  Thus, because the court has concluded that Proulx was not negligent, and because there is no evidence whatsoever to suggest that Sirois was negligent in supervising him, Warboys' federal claim for negligent supervision claim against Sirois fails.  The court therefore grants summary judgment in favor of the defendants on Count Six of the Amended Complaint.

     7.  <u>Pendent State Law Claims (Counts One, Two, Five, and Six)</u>.

     The defendants also move for summary judgment with respect to Warboys' state law claims: Count One alleging negligent infliction of emotional distress against Proulx; Count Two alleging intentional infliction of emotional distress against Proulx; Count Five alleging negligent supervision against Sirois; and Count Six brought against Proulx and Sirois based on a theory of indemnity under Conn. Gen. Stats. § 7-465.  Having granted summary judgment dismissing Warboys' federal claims, the court declines to exercise pendant jurisdiction with respect to these state law claims.  <u>See generally</u> <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 726 (1966)("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); <u>Lanza v. Merrill Lynch & Co.</u>, 154 F.3d 56 (2d Cir. 1998)("[W]hen the federal claims are dismissed the state claims should be dismissed as well. Although this is not a mandatory rule, the Supreme Court has stated that in the usual case

in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine–judicial economy, convenience, fairness and comity–will point toward declining jurisdiction over the remaining state-law claims.")(internal citations and quotation marks omitted).  The court therefore dismiss the remaining state law causes of action alleged in the Amended Complaint.

### III.    CONCLUSION

For the foregoing reasons, Warboys' motion to amend the complaint [Dkt. No. 24] is GRANTED, and the defendants' motion for summary judgment with respect to the entire amended complaint [Dkt. No. 17] is GRANTED with respect to the federal claims.  The pendant state law claims are dismissed.  The clerk is directed to close the case.

If Warboys has exhausted his fifth amendment takings claim, see infra, § II.B.3, note 11, he is granted permission to file a motion to reopen accompanied by an amended complaint alleging the same, within thirty days of this Ruling.

**SO ORDERED.**

Dated this 4th day of February, 2004, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge